FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

16 OCT -6  PM 1:50

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

PROPEP, L.L.C., d/b/a PROPEP SURGICAL,
L.L.C.,

                  **Plaintiff,**

-vs-                                           **Case No.  A-15-CA-356-SS**

MEDTRONIC XOMED, INC.,
                  **Defendant.**

---

## O R D E R

    BE IT REMEMBERED on the 24th of August 2016, the Court held a hearing in the above-styled caused.  The parties appeared by and through counsel.  Before the Court are Defendant Medtronic Xomed, Inc.'s (Medtronic) Motion for Summary Judgment [#68], Plaintiff ProPep, L.L.C.'s (ProPep) Response [#87] and Supplemental Letter Brief [#115] in opposition, and Medtronic's Reply [#94] and Supplemental Letter Brief [#116] in support.  Having considered the documents, the case as a whole, the arguments at the hearing, and the governing law, the Court now enters the following opinion and order.

### Background

    This case involves a confidentiality agreement between ProPep and Medtronic.  ProPep develops nerve monitoring technology for use in laparoscopic robotic-assisted radical prostatectomies.  *See* Resp. [#87] at 2.  Specifically, ProPep created a system and method of monitoring a patient's nerves during such procedures.[1]  *See id.*  On May 8, 2007, ProPep filed U.S.

---

    [1] According to ProPep, the most common complication of radical prostatectomy surgery is impotence and/or erectile dysfunction.  *See* Mot. [#68-3] Ex. 14 (Packet) at 5.  ProPep therefore developed its system and

Patent Application Number 11/745,505 (ProPep's Patent Application) entitled "System and Method for Laparoscopic Nerve Detection." *See* First Am. Compl. [#9] ¶ 5; Mot. [#68] at 5. ProPep's Patent Application was published on November 13, 2008. *See* Mot. [#68] at 6. The patent was issued as U.S. Patent Number 8,083,685 B2 (ProPep's Patent) on December 27, 2011. *See id.* at 6 n.2.

In early 2008, ProPep approached Medtronic to discuss the sale of its system and method. *See* Resp. [#87] at 3–4; Mot. [#68] at 1. During the negotiations and due diligence, ProPep and Medtronic entered into a "Unilateral Confidentiality Agreement Protecting Third Party Confidential Information" (UCA) on March 6, 2008.[2] *See* Resp. [#68] at 4. Under the UCA, the parties agreed ProPep would transfer Confidential Information to Medtronic "for the sole purpose of evaluating future business dealings between the Parties in which [ProPep] will allow Medtronic [] to use certain technologies developed by [ProPep] . . . for an agreed licensing fee (hereinafter 'Purpose of this Agreement')." Mot. [#68-2] Ex. 13 (UCA) at 1.

Section 2 of the UCA defines the term "Confidential Information" to include information that at the time of disclosure was (1) tangible and (2) marked confidential. *See id.* ¶ 2. The definition also includes intangible information that was marked confidential at the time of disclosure as long as ProPep provided Medtronic a tangible version within 20 days of the initial disclosure. *See id.* Section 2 also provides a specific provision for surgical demonstrations, explaining demonstrations

---

method to improve the vision and dexterity of the surgeon, particularly with regard to the patient's nerves. *See id.*

[2] The parties do not dispute the UCA's effective date is March 6, 2008, even though Medtronic signed the UCA on March 26 and ProPep signed it on March 28. *See* Resp. [#68] at 4. In addition, there is no dispute the UCA is governed by New York law.

will be confidential under the UCA if ProPep provides "a written statement of the date, time, place and brief description of the surgical procedure accompanied with a video recording of the procedure" to Medtronic. *Id.*

Section 3, however, describes certain exceptions to the category of Confidential Information. Specifically, Medtronic's use of Confidential Information is not limited if the Confidential Information:

> (a) is well-known publicly and therefore in the public domain; or . . .
>
> (c) can be demonstrated to have been known by Medtronic as shown by written documents dated prior to the date of this Agreement or hereafter developed by Medtronic . . . independently of any disclosure of "Confidential Information" by [ProPep]; or . . .
>
> (e) is information that is freely disclosed by [ProPep] to any third party without obligation of confidentiality or nondisclosure . . . .

*Id.* ¶ 3.

Section 3 also explains, albeit poorly, Medtronic's duty with regard to Confidential Information: Medtronic "shall use the Confidential Information only for the Purpose of this Agreement and shall hold the disclosure of Confidential Information in confidence, disclosing it only to its employees Confidential Information only to the extent necessary to fulfill the intent and terms of this Agreement." *Id.* The UCA also recognizes Medtronic will continue to work in the nerve monitoring arena and states Medtronic "has been, is, and will continue to be engaged in various research and development projects, one or more of which may relate to the Purpose of this Agreement, but not including [ProPep's] disclosed Confidential Information . . . ." *Id.* ¶ 8.

After the parties executed the UCA, ProPep shared two types of information with Medtronic:

(1) three surgical demonstrations[3] of ProPep's technology (Demonstrations); and (2) a packet of documents entitled "System and Method for Laparoscopic Nerve Detection During Radical Prostatectomy" (Packet). *See* First Am. Compl. [#9] ¶¶ 7–8; Resp. [#87] at 4–5. The parties disagree about whether this information falls within the definition of Confidential Information under the UCA.

After ProPep provided the Demonstrations and the Packet, Medtronic made ProPep an offer to purchase a license of ProPep's system and method in April 2009. *See* Resp. [#87] at 6. When ProPep rejected the offer in May 2009, negotiations between the two entities ended and Medtronic returned "ProPep's written and electronic Confidential Information." *See id.* at 7; First Am. Compl. [#9] ¶ 10. On April 30, 2010, Medtronic filed a patent application entitled "Interface Module for Use with Nerve Monitoring and Electrosurgery" (Medtronic's Patent Application). *See* Resp. [#87] at 9–10; Mot. [#68] at 13–14. Medtronic's Patent Application was published on November 3, 2011, and is currently pending, as the claims have been rejected several times. *See* Mot. [#68] at 14. Medtronic also funded and developed a clinical study (Clinical Study) entitled "Intraoperative Periprostatic Nerve Action Potential Monitoring During Robotic Prostatectomy," which was presented at the American Urological Association Conference. *See* First Am. Compl. [#9] ¶¶ 13–14.

On May 13, 2011, ProPep filed a continuing patent application entitled "Nerve Mapping Surgical System and Method of Use of Dual Function Surgical Instrument within Such System" (ProPep's Continuation-in-Part Patent), which was rejected as unpatentable in light of Medtronic's Patent Application. *See id.* ¶ 12; Resp. [#87] at 10.

---

[3] The surgical demonstrations took place at Westlake Hospital in Austin, Texas on August 5, 2008, December 10, 2008, and December 22, 2008. First Am. Compl. [#9] ¶ 8.

In this suit, ProPep brings four claims against Medtronic: (1) breach of contract; (2) misappropriation of trade secrets and unfair competition; (3) breach of implied covenant of good faith and fair dealing; and (4) conversion. *See* First Am. Compl. [#9] ¶¶ 18–33. Underlying each of these claims is ProPep's allegation that Medtronic utilized Confidential Information provided by ProPep to develop Medtronic's Patent Application. *See id.* ¶ 11; Resp. [#87] at 9–10. ProPep also asserts Medtronic's Clinical Study was improperly based on Confidential Information. *See* Resp. [#87] at 11.

On June 26, 2016, Medtronic moved for summary judgment on all four claims. *See* Mot. [#68]. ProPep filed its response on July 21, 2016, and Medtronic replied on July 27, 2016. On August 24, 2016, the Court held a summary judgement hearing, after which the parties submitted supplemental letter briefs. *See* Pl.'s Supp. Letter Br. [#115]; Def.'s Supp. Letter Br. [#116]. The motion is now ripe for review.

## Analysis

### I.    Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.     Application

## A.     Breach of Contract

Under New York law, "[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, [and] (4) resulting damage." *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 872 (N.Y. Sup. 2015) (quoting New York Pattern Jury Instruction Civil 4:1). Medtronic moves for summary judgment on the third element, arguing it did not breach the UCA because (1) the information ProPep provided, specifically the Demonstrations and the Packet, was not Confidential Information as defined by the UCA, and (2) Medtronic did not use any of the information ProPep provided to develop Medtronic's Patent Application or its Clinical Study.

### i.     The Demonstrations

Medtronic asserts the three surgical Demonstrations do not constitute Confidential Information under the UCA, and therefore, Medtronic did not owe a duty to limit its use of the information obtained from the Demonstrations. *See* Mot. [#68] at 12.  Specifically, Medtronic argues that because ProPep did not tell Medtronic the Demonstrations were confidential or provide a video recording of the demonstrations, as required by Section 2 of the UCA, they cannot be considered Confidential Information. *See id.*; UCA ¶ 2 ("With respect to surgical demonstrations, . . . the parties agree that a written statement of the date, time, place and brief description of the surgical procedure accompanied with a video recording of the procedure shall meet the [confidentiality] requirement of this Section 2.").  ProPep replies that Section 2 does not require ProPep to give Medtronic a written description and a video recording of the procedure. *See* Resp. [#87] at 20 n.3.  Rather, according to ProPep, the passage in Section 2 "[d]escribes a method of

bringing a surgical demonstration within the bounds of the UCA, but it does *not* state this method

is the *exclusive* means for doing so." *See id.*

The Court finds the Demonstrations did not constitute Confidential Information as described

by the UCA. *See Hanssen v. Qantas Airways Ltd.*, 904 F.2d 267, 270 n.3 (5th Cir. 1990) ("The

interpretation of an unambiguous contract is [a] legal question . . . and a court may decide the issue

on a motion for summary judgment."). The plain language of the UCA makes it clear that in order

to identify the surgical Demonstrations as Confidential Information, ProPep was required to provide

the Demonstrations "(1) in writing or other tangible form (tangible form includes a digital versatile

disk (DVD) . . . and (2) clearly identif[y] on its face as being Confidential Information, or as in the

case of recording such as a DVD, it is labeled Confidential Information." UCA ¶ 2. The Court

agrees with ProPep that the surgical demonstration-specific clause in Section 2 provides another

option for identifying the Demonstrations as Confidential Information. But ProPep not only failed

to provide Medtronic a written description of the surgical procedures, but it also failed to comply

with the general confidentiality requirements under Section 2: ProPep did not (1) provide the

Demonstrations in a tangible form or (2) clearly identify the Demonstrations as confidential. *See*

Mot. [#68] at 12. Ultimately, ProPep does not provide any evidence that the Demonstrations were

designated as Confidential Information in accordance with the UCA.[4]

Despite its failure to provide evidence showing the Demonstrations were Confidential

Information, almost all of ProPep's evidence supporting Medtronic's alleged breach of the UCA is

---

[4] In its Response, ProPep states, "Medtronic cannot credibly argue—and it never has—that it *didn't in fact know* the contexts of the surgical procedures were confidential under the [UCA] and trade-secret protected." Resp. [#87] at 20 n.3. ProPep, however, provides no authority explaining why Medtronic's subjective belief about whether the Demonstrations were Confidential Information is at all relevant. Thus, the Court applies the plain language of the UCA, which ProPep failed to follow.

based on Medtronic utilizing information from the Demonstrations.  For example, ProPep argues a Medtronic representative, Dave Hacker, attended the live Demonstrations to "understand the surgical monitoring needs and identify what changes would be needed to the [Medtronic's NIM monitor] or electrodes for this procedure."  Resp. [#87] at 7.  ProPep claims at these Demonstrations, "Mr. Hacker learned how to calibrate the NIM 2.0's settings to improve its monitoring performance by: (1) turning off event tones; (2) setting the artifact delay to 0.8mS; (3) setting the stimulus duration at 50uS; and (4) setting the stimulus level at 0.8-2mA."  *Id.* at 8.  As explained above, this information provided by the Demonstrations is not Confidential Information and cannot be the basis of Medtronic's breach.  Thus, the Court GRANTS summary judgment with respect to ProPep's breach of contract claim to the extent ProPep claims Medtronic used information obtained from the Demonstrations in violation of the UCA.

### ii.     The Packet

Medtronic similarly argues the Packet is not protected as Confidential Information under the UCA and thus Medtronic could not have breached the UCA.  The Packet contains a confidentiality statement, a statement of the goals of integrating ProPep and daVinci Robotics, an introductory statement, a written explanation of ProPep's system and methods including figures and photos, a description of the benefits of the technology, legal disclaimers, a description of similar applications, a summary of pricing a revenue, and a conclusion.  *See* Mot. [#68-3] Ex. 14 (Packet) .

Although the Packet is tangible and marked confidential as required by Section 2 of the UCA, Medtronic argues it falls within the exceptions under Section 3 of the UCA.  *See* Mot. [#68] at 17–18.  First, Medtronic claims the title, technical disclosure, and figures from the Packet are essentially identical to ProPep's Patent Application.  *Compare* Packet, *with* Mot. [#68-2] Ex. 12

(ProPep's Patent Application).   Thus, those aspects of the Packet fall under the Section 3(a) exception because they are "well-known publicly and therefore in the public domain."   *See* Mot. [#68] at 9–11; Def.'s Supp. Letter Br. [#116] at 1 ("[T]here can be no claim for breach of contract based on Medtronic's alleged use of ProPep's nerve monitoring system and method because both were ***shared without obligation of confidentiality*** when ProPep filed its patent application in 2007 and both were in the public domain in 2008.").   Second, Medtronic argues ProPep disclosed certain photographs from the Packet during a ProPep presentation at a public urology conference in 2007. *Compare* Packet, *with* Mot. [#68-2] Ex. 10 (2007 Presentation).   These photographs fall under Section 3(e) of the UCA, according to Medtronic, because they were freely disclosed by ProPep to third parties at the conference without an obligation of confidentiality or nondisclosure.   *See* Mot. [#68] at 10–12.

The Court agrees with Medtronic that any information from ProPep's Patent Application after it was published on November 13, 2008, that is also part of the Packet, has been publicly disclosed.[5] *See Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1306 (Fed. Cir. 2012) ("Filing a patent application and commercializing a product are only two convenient ways of proving an invention has been disclosed to the public.").   During the time period, however, between when ProPep's Patent Application was filed in May 2008 and when it was published in November 2008, the information in ProPep's Patent Application had arguably not been made publicly available.   *See* Pl.'s Supp.

_____

[5] ProPep seems to argue that information found within a published patent application has not been publicly disclosed. *See* Summ. J. Hr'g Tr. [#117] at 28:22–29:3 ("And so, when we at ProPep provided to Medtronic this confidential information, it was well-known publicly that ProPep was the only company that had the ability to perform this nerve monitoring of laparoscopic environment in prostate surgeries.  But what was not well-known publicly, your Honor, despite the fact that a patent application was filed, is how they did it.").  The Court rejects this baseless argument.

-10-

Letter Br. [#115] at 2. And since the UCA was executed in March 2008, Medtronic had access to the Packet before ProPep's Patent Application was published.

In addition, ProPep claims there are four key pieces of information included in the Packet that were not part of ProPep's Patent Application and thus not part of the public domain: (1) the use of a clinical diagnostic monitor (Cadwell monitor); (2) the setting of the Cadwell monitor that best facilitated visualization of waveform data, which helps surgeons identify nerves during surgery; (3) the process of stimulating and record a nerve directly, rather than from surrounding muscle tissue; and (4) the possibility of adapting ProPep's system for use with Intuitive Surgical's da Vinci Robot.[6] *See* Pl.'s Supp. Letter Br. at 1–2; Summ. J. Hr'g Tr. [#117] at 24:12–15 ("The first thing that was disclosed to [Medtronic] that's not in the patent, that wasn't publicly disclosed is the use of this Cadwell monitor, which is separate and apart from the type of monitor that Medtronic was using."). ProPep also claims the switchbox ProPep developed was "not contained explicitly in ProPep's original patent application filed in 2007."[7] *See* Pl.'s Supp. Letter Br. at 3; Summ. J. Hr'g

---

[6] In its Response, ProPep argued the Packet contained "an explicit reference to ProPep's then-pending, but unpublished patent," and claimed "[t]he jury should decide whether this explicit cross reference of ProPep's patent application brought either the entirety or a portion of ProPep's system and method within the protection of the UCA." Resp. [#87] at 13, 20 n.3 ("The reference in the [Packet] to ProPep's patent application directed Medtronic to a specific, highly detailed description of ProPep's system and method encompassing every trade-secret-protected aspect of Dr. Fagin's surgical procedure 'in written or other tangible form.'"). Medtronic claims this is an admission the Packet only constituted ProPep's entire Patent Application and was thus in the public domain. *See* Reply [#94] at 2 n.2. The Court, however, does not interpret ProPep's statement as broadly and accepts ProPep's argument at the summary judgment hearing and in its Reply brief that the Packet contained Confidential Material that was not included in ProPep's Patent Application.

[7] Medtronic claims this argument, made at the summary judgment hearing and in ProPep's subsequent Supplemental Letter Brief, contradicts ProPep's Response, which states the ProPep Patent Application contained "'a specific, highly detailed description of ProPep's system and method encompassing every trade-secret-protected aspect' of its surgical procedure." *See* Def.'s Supp. Letter Br. [#116] at 2. Medtronic also provides deposition testimony from ProPep's founder and CEO admitting the switchbox was disclosed in ProPep's Patent Application. *See* Reply [#94-1] Ex. 41 (Schiff Dep. Tr.) at 108:7–109:25; *id.* Ex. 42 (Stone Dep. Tr.) at 138:4–139:14. The Court agrees with Medtronic that "a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000);

Tr. [#117] at 21:6–7, 31:8–9 ("The switch box is not contained in the first patent . . . . The switch box was not publicly disclosed. The switch box was not part of the ProPep patent."). ProPep also argues that the photographs contained in the Packet were not "freely disclosed by [ProPep] to any third party without obligation of confidentiality or nondisclosure," because the photographs were part of a presentation to six people and "are nothing more than a brief, superficial description of nerve monitoring . . . [that] did not disclose the presence or use of a Cadwell Monitor 5200A[,] . . . the switching device . . . [or] any detail on the design of the 'unique insertion device.'" Resp. [#87] at 14.

   The Court finds ProPep has presented a genuine issue of material fact regarding whether the Packet contained Confidential Information. Medtronic does not dispute the descriptions and figures in the Packet identical to those in ProPep's Patent Application only became publicly disclosed when ProPep's Patent Application was published on November 13, 2008. *See* Mot. [#68] at 17 ("It is undisputed that the technical disclosure in the [Packet] was disclosed in the ProPep Patent Application, which was published on November 13, 2008."). Nor does Medtronic dispute that the four key pieces of information listed above were included in the Packet and not in ProPep's Patent Application. *See* Def.'s Supp. Letter Br. at 3 (arguing instead that Medtronic did not use ProPep's Cadwell monitor, for example, in the Medtronic Patent Application or in the Clinical Study). The Court thus finds ProPep has established a genuine issue of material fact with regard to whether the Packet constituted Confidential Information under the UCA.

---

Def.'s Supp. Letter Br. [#116] at 2. But ProPep has provided other evidence (including, as explained above, that there was a time period where Medtronic had access to the Packet before ProPep's Patent Application was published) that illustrates a genuine issue of material fact with regard to whether the Packet contained Confidential Information.

The Court now determines if a fact issue exists with regard to whether Medtronic used ProPep's information in violation of the UCA. Medtronic does not extensively address this issue in its briefing; its main focus is that Medtronic could not have breached the UCA because the information ProPep provided was not confidential. Still, Medtronic argues it "developed [its own] switch [for a surgical instrument to alternatively deliver nerve stimulation and electrocautery energy] in 2006, well before it ever knew or met ProPep." *See* Summ. J. Hr'g Tr. [#117] at 10:20–24; Mot. [#68] at 13–14. In response, ProPep presents testimony from Kevin McFarlin, a Medtronic's representative, that the device Medtronic was developing in 2006 was in monopolar form, not bipolar form. *See* Aff. Supp. Resp. [#88-20] Ex. 20 (McFarlin Dep. Tr.) 13:1–25, 31:1–25. Thus, because Medtronic's Patent Application (filed in 2011) seeks protection for the bipolar form, ProPep argues Medtronic used information ProPep provided regarding its own bipolar instrument. *See* Pl.'s Supp. Letter Br. [#115] at 2. In light of this evidence, the Court concludes ProPep has established a fact issue with regard to whether Medtronic's utilized ProPep's system and method.[8]

The Court therefore GRANTS summary judgment with respect to ProPep's breach of contract claim based on Medtronic's use of information provided via the Demonstrations and DENIES summary judgment with respect to ProPep's breach of contract claim based on Medtronic's use of information provided via the Packet. The jury will determine if and when Medtronic used any

---

[8] The Court does not consider ProPep's evidence of Medtronic's alleged misuse of the non-confidential information Medtronic learned from the Demonstrations. *See* Resp. [#87] at 7–8. For example, ProPep argues Mr. Hacker used the knowledge he gained from the Demonstrations to adjust Medtronic's NIM monitor so it could "perform Auditory monitoring distinctly being able to detect 'Nerve' and 'Non-Nerve' locations like [ProPep's] Cadwell monitor." *See id.* [#87-3] Ex. 11 (January 5, 2008 Medtronic Interoffice Memorandum) at 1. Since the information Mr. Hacker allegedly used was from the Demonstration, it was not confidential and thus did not fall within the scope of the UCA. *See infra* Section II.A.i.

Confidential Information in the Packet for a purpose other than "evaluating future business dealings"

with ProPep, as described by the UCA.

## B.      Misappropriation of Trade Secret and Unfair Competition

"Trade secret misappropriation under Texas law is established by showing: (a) a trade secret

existed; (b) the trade secret was acquired through a breach of a confidential relationship or

discovered by improper means; and (c) use of the trade secret without authorization from the

plaintiff." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) (internal quotations

and citation omitted).  To determine whether information is protectable as a trade secret, the Texas

Supreme Court has instructed courts to look to six factors relevant to the secrecy of the information:

> (1) the extent to which the information is known outside of his business; (2) the
> extent to which it is known by employees and others involved in his business; (3) the
> extent of the measures taken by him to guard the secrecy of the information; (4) the
> value of the information to him and to his competitors; (5) the amount of effort or
> money expended by him in developing the information; [and] (6) the ease or
> difficulty with which the information could be properly acquired or duplicated by
> others.

*In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003).  These six factors do not constitute a required

checklist, nor are they the only relevant factors to consider.  *Id.* at 740.

First, Medtronic argues ProPep's system and method cannot constitute a trade secret because

every aspect of ProPep's system and method was disclosed in ProPep's published Patent

Application.  Mot. [#68] at 10, 21–25.  The Court again agrees with Medtronic that any information

from ProPep's Patent Application after it was published on November 13, 2008, cannot be a trade

secret.  *See Aquasource Holdings, LLC v. Oxxytec, Inc.*, No. CIV.A. H-11-1681, 2011 WL 3269320,

at *3 (S.D. Tex. July 28, 2011) ("Subject matter publicly disclosed, including that which is disclosed

in an issued patent or in a published patent application, is not secret and thus cannot be protected as a trade secret.") (quoting *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964)).

The same factual disputes, however, involved in ProPep's breach of contract claim based on the Packet exist here. As explained in Section II.A.ii., there is a time period from March 2008 to November 2008 where ProPep's Patent Application had not yet been published and Medtronic had access to and allegedly used ProPep's Confidential Information. *See* Pl.'s Supp. Letter Br. [#115] at 2. ProPep has also provided evidence that the Packet included aspects of the technology that were not part of ProPep's Patent Application. *See id.* at 1–2; Summ. J. Hr'g Tr. [#117] at 24:12–15.

Second, Medtronic argues it did not acquire ProPep's system and method through improper means. *See* Mot. [#68] at 23. Medtronic and ProPep's confidential relationship was defined by the UCA. Because the Court found a fact issue regarding Medtronic's breach of that confidential relationship, there is also a fact issue regarding Medtronic's allegedly improper acquisition of ProPep's system and method. *See id.*; Resp. [#87] at 18–19.

Third, Medtronic claims it did not use ProPep's system and method. *See* Mot. [#68] at 23–24. As described in Section II.A.ii., however, ProPep has presented testimony that Medtronic used ProPep's alleged trade secret as early as 2006 to develop the device for which Medtronic ultimately filed its Patent Application. *See* McFarlin Dep. Tr. 13:6–22, 31–32. Further, the Court is not convinced by Medtronic's argument that this third element of ProPep's trade misappropriation claim is not met since Medtronic never used "the ***combination of five elements***" ProPep claims makes up its system and method in the Medtronic Patent Application or Clinical Study. *See* Mot. [#68] at 24–25; Reply [#94] at 3–4 (citing *Vital State Can., Ltd. v. DreamPak, LLC*, 303 F. Supp. 2d 516, 529 (D.N.J. 2003) for the rule that plaintiff "must prove use of each and every element in

-15-

combination"). The Fifth Circuit has noted that "the definition of 'use' is 'broad' and includes such activities as 'marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret.'" *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 600 (5th Cir. 2015) (internal citation omitted); *see also Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 269 n.35 (5th Cir. 2007) ("A plaintiff need not prove an actual sale or production of a product to show 'use' of its trade secrets."). While not all of aspects of ProPep's alleged trade secret are immediately apparent in Medtronic's Patent Application or Clinical Study, ProPep has presented enough evidence to established a fact issue regarding whether Medtronic used ProPep's system and method during the research and development phase of Medtronic's own technology. Thus, the Court DENIES summary judgment with respect to ProPep's misappropriation of trade secret claim.[9] Similar to the breach of contract claim, the jury will determine if and when Medtronic improperly used a trade secret of ProPep's.[10]

---

[9] Medtronic also moves for summary judgment on ProPep's unfair competition claim based on misappropriation of trade secret. *See* Mot. [#68] at 25. The statute of limitations for such a claim is two years. *J.M. Huber Corp. v. Positive Action Tool of Ohio Co.*, 879 F. Supp. 705, 708 (S.D. Tex. 1995) (citing TEX. CIV. PRAC. & REM. CODE § 16.003(a)). "The statute of limitations begins to run on a cause of action when the wrongful conduct (the misappropriation) occurs . . . , and when a party either discovers the misappropriation or has sufficient facts to require an investigation into whether a misappropriation occurred." *Id.* Medtronic's alleged misappropriation occurred when it filed the Medtronic Patent Application on April 30, 2010 (and before), and ProPep admits it "first learned about the Medtronic Patent on April 3, 2013 during a patent sweep." Resp. [#87] at 10. ProPep provides no evidence or argument to the contrary. Thus, because limitations have run, the Court GRANTS summary judgment with regard to ProPep's unfair competition claim.

[10] Despite finding a fact issue with regard to the breach elements of ProPep's breach of contract and misappropriation of trade secret claims, the Court is highly skeptical of ProPep's ability to prove the fourth element: resulting damage. To show harm, ProPep argues: (1) the existence of Medtronic's Patent Application decreased ProPep's value and (2) Medtronic's presentation of its negative Clinical Study findings required ProPep to conduct its own study to "defend the efficacy of its system and method." Resp. [#87] at 10–11. The Court, however, cannot decide summary judgment on a theory Medtronic has not argued. *See John Deere Co. v. Am. Nat. Bank, Stafford*, 809 F.2d 1190, 1191 (5th Cir. 1987); Mot. [#68] at 24–25 (arguing Medtronic's Patent Application and Clinical Study did not incorporate ProPep's Confidential Information or trade secrets, but not that ProPep

C.    **Breach of Implied Covenant of Good Faith and Fair Dealing**

"Texas law does not impose a generalized contractual duty of good faith and fair dealing and, in fact, rejects it in almost all circumstances . . . . But in an extremely narrow class of cases, the Texas courts have determined that a special relationship may give rise to a tort duty of good faith and fair dealing." *Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016).  Such relationships are "earmarked by specific characteristics including: long standing relations, an imbalance of bargaining power, and significant trust and confidence shared by the parties," and must "exist before and apart from the contract or agreement that forms the basis of the controversy." *Id.*

None of these circumstances apply here.  ProPep and Medtronic are sophisticated entities that voluntarily entered into the UCA with equal bargaining power.  They had no relationship before entering into the agreement. *See* Mot. [#68] at 19; Resp. [#87] at 3–4.  The authority ProPep cites to support its claim, particularly *Sanus/N.Y. Life Health Plan, Inc. v. Dube-Seybold-Sutherland Mgmt., Inc.*, 837 S.W.2d 191 (Tex. App.—Houston [1st Dist.] 1992, no pet.), is unpersuasive. *See* Resp. [#87] at 23–25.  In *Sanus*, a dental corporation (DSS) entered into a contract with an HMO. *Id.* at 193.  The HMO agreed to maintain and provide certain information for DSS, who had no independent means of verifying the information. *Id.*  The trial court found DSS and the HMO had a special relationship because:

> (1) DSS had no sources of information, other than information within [the HMO's] control, upon which it could reasonably rely to determine which patients to treat and how much capitation it was owed, (2) DSS was totally dependent on that information and relied exclusively on [the HMO] to provide it, (3) such information was crucial to DSS, and (4) [the HMO] knew DSS was relying on it, knew it was failing to provide the information, and knew that it did not intend to provide the information.

---

failed to show resulting damage).  Thus, the Court will later consider motions for judgment as a matter of law on this issue.

*Id.* at 199.  After explaining this case, ProPep states it had a special relationship with Medtronic because, under the UCA, ProPep "had to *trust* Medtronic would . . . refrain from using ProPep's confidential information." Resp. [#87] at 25.  The Court finds no parallels between this situation and the one in *Sanus*.  ProPep did not have to trust Medtronic to comply with the UCA any more than any party has to trust that another party to a contract will satisfy its contractual obligations. ProPep and Medtronic's relationship, then, was not special and did not impose an implied duty of good faith and fair dealing.  The Court GRANTS summary judgment with respect to ProPep's breach of implied covenant of good faith and fair dealing claim.

**D.    Conversion**

Conversion is a tort "defined as 'the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.'" *Bandy v. First Nat'l Bank, Overton, Tex.*, 835 S.W.2d 609, 622 (Tex. 1992) (quoting *Tripp Vill. Joint Venture v. MBank Lincoln Ctr., NA.*, 774 S.W.2d 746, 750 (Tex. App.—Dallas 1989, writ denied).  Its elements are: (1) the plaintiff owned, possessed, or had the right to immediately possess the property; (2) the property was personal property; (3) the defendant wrongfully and without authorization exercised dominion or control over the property; and (4) the plaintiff was thereby injured. *See* O'CONNOR'S TEXAS CAUSES OF ACTION *Conversion* § 1.1 (2011) (citing, *inter alia, Green Int'l, Inc. v. Soiis*, 951 S.W.2d 384, 391 (Tex. 1997); *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex. 1997)).  "In general, the tort of conversion is limited to tangible property . . . .  However, Texas law does recognize conversion claims based on intangible property if the underlying intangible right has been merged into a document, and that document has been converted." *Sefton v. Jew*, 201 F. Supp. 2d 730, 751 (W.D. Tex. 2001) (internal citation omitted).  "Only 'where the underlying intangible right has been

-18-

merged into a document,' like a customer list, and 'there has been conversion of that document,' will courts extend a conversion claim to the copying of intangible information." *In re Simons Broad., LP,* No. CIV. W-11-CA-172, 2013 WL 9542015, at *13 (W.D. Tex. Nov. 19, 2013) (internal citation omitted).

It is not clear from ProPep's breifing what Medtronic allegedly converted.  In its First Amended Complaint, ProPep stated Medtronic returned "ProPep's written and electronic Confidential Information," but "wrongfully exercised dominion" over ProPep's intellectual property "[b]y using ProPep's demonstration to develop, patent, study and present its own" device. First Am. Compl. [#9] ¶¶ 10, 28.  In its Response, ProPep now claims its system and method has been merged into certain documents, which have been improperly retained by Medtronic.  Specifically, ProPep states, Mr. Hacker took photographs of ProPep's Cadwell Monitor during one of the Demonstrations and "printed them out for this litigation . . . seven months ago."  Resp. [#87] at 22.  ProPep claims Mr. Hacker also kept a "3D rendering of ProPep's 'electrode introducer,'" which he printed for his deposition and included in a presentation for Medtronic's management.  *Id.*

To the extent ProPep argues Medtronic converted intangible information received only orally or through physical demonstration, its claim must fail.  Intangible information, without being merged into a document that is then converted, cannot be the basis for a conversion claim.  *See Sefton*, 201 F. Supp. 2d at 751.  ProPep's arguments that intangible information from the Demonstrations is merged into a document because it was printed for litigation purposes, such as a deposition, similarly fails.  ProPep claims 3D renderings of ProPep's "electrode introducer" were "merged into documentary form for Mr. Hacker's deposition [on December 8, 2015], but they were not returned to ProPep in response to its demand [on May 29, 2009,] that Medtronic return ProPep's condifential

information." Resp. [#87] at 22.  Under the merger doctrine, however, the merged document—here, the deposition documents—must be what is converted.  *See In re Simons Broad., LP*, 2013 WL 9542015, at \*13; *Xpel Techs. Corp. v. Am. Filter Film Distribs.*, No. CIVA SA-08-CA175-XR, 2008 WL 3540345, at \*5 (W.D. Tex. Aug. 11, 2008) ("If the president of Coke . . . wrote the formula on a sheet of paper that the competitor then illegally seized, Coke could have a claim for conversion of the paper because a physical document is an item capable of being possessed by only one person or company at a time.").  ProPep has provided no evidence that Medtronic wrongfully exercised dominion over the deposition documents.

Finally, ProPep argues the 3D renderings were merged into a physical document for a presentation to Medtronic's management, "probably sometime after [Mr. Hacker observed] the surgeries . . . ."  Resp. [#87] at 22.  There is no evidence, however, showing Medtronic wrongfully exercised dominion over the presentation document.  ProPep claims, "one of Medtronic's top engineers retained this information long after expressing his intent to adjust [Medtronic's] NIM 2.0 and NIM 3.0's hardware and software settings to better monitor nerves." *Id.* at 23.  Yet the exhibits cited for this proposition are two internal Medtronic memorandum summarizing the Demonstrations. *See id.* [#87-2] Ex. 10 (November 25, 2008 Medtronic Interoffice Memorandum); *id.* [#87-3] Ex. 11 (January 5, 2008 Medtronic Interoffice Memorandum).  As far as the Court can tell, nothing in those memos indicate Medtronic converted a physical document (including the memos themselves).

ProPep has failed to create a genuine issue of material fact regarding its conversion claim. The Court thus GRANTS summary judgment with respect to ProPep's conversion claim.

**Conclusion**

In light of the foregoing, the Court GRANTS IN PART and DENIES IN PART Medtronic's Motion for Summary Judgment. ProPep's alleged breach of contract and misappropriation of trade secrets claims survive summary judgment to the extent they are based on Medtronic's improper use of the Packet, not the Demonstrations. On the other hand, ProPep's alleged breach of the implied covenant of good faith and fair dealing and conversion claims fail as a matter of law.

Accordingly,

IT IS FINALLY ORDERED that Defendant Medtronic's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART as described in this opinion.

SIGNED this the _____ 6th _____ day of October 2016.

SAM SPARKS
UNITED STATES DISTRICT JUDGE